# EXHIBIT 2

## Page 1

```
IN THE UNITED STATES DISTRICT COURT
 FOR THE SOUTHERN DISTRICT OF TEXAS
         BROWNSVILLE DIVISION

HUGO MEDELLIN,          )(
   Plaintiff            )(
                        )(
VS.                     )(  CIVIL ACTION NO:
                        )(  1:22-CV-084
                        )(
SPACE EXPLORATION       )(
TECHNOLOGIES, CORP., ET AL, )(
   Defendants          )(
```

_____

        ORAL DEPOSITION OF
         ARION MORSHEDIAN
         FEBRUARY 16, 2023
         (Reported Remotely)

_____

    ORAL DEPOSITION OF ARION MORSHEDIAN, produced as a witness at the instance of the Plaintiff, taken in the above-styled and numbered cause on FEBRUARY 16, 2023, between the hours of 12:34 p.m. and 2:26 p.m., reported by oral stenography by DARLA BARKER, Certified Court Reporter No. 10980, in and for the State of Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached therein.

## Page 2

```
               APPEARANCES
COUNSEL FOR PLAINTIFF:
   MARIO A. CISNEROS (Attending via Zoom)
   BEGUM LAW GROUP
   2401 Wild Flower Drive, Suite B
   Brownsville, Texas  78526

COUNSEL FOR DEFENDANTS:
   MICHELLE D. PECTOR (Attending via Zoom)
   MORGAN, LEWIS & BOCKIUS LLP
   1000 Louisiana, Suite 4000
   Houston, Texas  77002

   -- and --

   DAVID OLIVEIRA (Attending via Zoom)
   ROERIG, OLIVEIRA & FISHER, LLP
   10225 North 10th Street
   McAllen, Texas  78504
   -- and --
   CELIA E. GUERRA (Attending via Zoom)
   BROCK GUERRA STRANDMO DIMALINE JONES, P.C.
   17339 Redland Road
   San Antonio, Texas  78247

ALSO PRESENT: Aaron Gonzalez, Zoom Host
              (Attending via Zoom)

              Alison Abel, SpaceX In-House Counsel
              (Attending via Zoom)

                INDEX
                                         PAGE
Appearances ........................  2

ARION MORSHEDIAN

Examination by Mr. Cisneros ........  4
```

## Page 3

```
              INDEX
            (Continued)
                                         PAGE

Changes/Signature Page ...........  84
Reporter's Certificate ...........  86
Attached to the end of the transcript: Stipulations

              EXHIBITS
                                         PAGE
NUMBER   DESCRIPTION                     IDEN.

1   Texas Peace Officer's Crash Report ....... 45
2   E-Mail From Arion Morshedian to Sergio
    Lara, 6-14-21 ........................... 50
3   Video (Medellin Dashcam) ................. 53
4   Video (Tesla Dashcam) .................... 55
5   Motor Vehicle Record ..................... 79
6   Photograph ............................... 80
```

## Page 4

   THE REPORTER: Today is FEBRUARY 16th, 2023, and the time is 12:34 p.m. This is the deposition of ARION MORSHEDIAN, and it's being conducted remotely.
   My name is Darla Barker, CSR No. 10980. I am reporting the deposition from Harlingen, Texas, and the witness is located in Los Angeles, Texas.
   Will counsel please state their appearances and locations for the record, beginning with the requesting attorney first?
   MR. CISNEROS: This is Mario Cisneros, and I'm taking this deposition from my office in Brownsville, Texas, and I am here on behalf of the plaintiff, Hugo Medellin.
   MS. PECTOR: This is Michelle Pector, counsel for defendants, taking this deposition -- or attending this deposition from my office in Houston, Texas.
   MS. GUERRA: Celia Guerra, co-counsel for defendant and witness today, from my office in San Antonio, Texas.
   (Witness sworn.)
       ARION MORSHEDIAN,
having been duly sworn, testified as follows:
       EXAMINATION
BY MR. CISNEROS:

Page 13

1  would have been the address to that bedroom?
2     A. June -- I don't recall exactly. I didn't have a
3  lease for longer than six months at a time in Texas.
4  That was right at the intersection between two different
5  apartment complexes that I was at.
6     Q. Which apartment complexes?
7     A. Las Palmas, and I did a sublease at Bella Vista.
8     Q. Okay. You said that the apartment you were at
9  was between those two apartment complexes? Is that what
10 you said?
11    A. At this time, the two was -- was right around
12 when I was living between them, so I don't remember
13 exactly.
14    Q. Okay. So at that particular apartment, where you
15 were staying at the time of this crash, how long had you
16 been there prior to the crash?
17    A. I don't recall.
18    Q. Okay. Would it have been more than a month?
19 Less than a month?
20    A. I would have to go look at the date. I couldn't
21 tell you right now.
22    Q. Okay. So how long were you at that address after
23 the crash?
24    A. Again, I don't remember. Like, my apartment
25 history is pretty fragmented in Texas.

Page 14

1     Q. Okay. So let me just make sure I have all the
2  apartment complexes down, then, that you've stayed at.
3  You said you stayed at Las Palmas; is that correct?
4     A. That's correct.
5     Q. You stayed at Bella Vista; is that correct?
6     A. Uh-huh.
7     Q. Any other apartment complexes that you stayed out
8  in Brownsville?
9     A. No. From Bella Vista, I went to the house, to
10 the bedroom in the house.
11    Q. Okay. So the four -- or the three places you
12 stayed at in Brownsville is an apartment at Las Palmas,
13 an apartment at Bella Vista, and the Rawhide address; is
14 that correct?
15    A. That's correct.
16    Q. And you're unsure of the dates or the amount of
17 time you were at each location; is that correct?
18    A. Yeah. I can tell you the longest was the Rawhide
19 house.
20    Q. Okay. All right. So you were hired in 2020 by
21 SpaceX; is that correct?
22    A. Uh-huh.
23    Q. So when were you assigned, or when were you sent
24 to Brownsville?
25    A. I started in Brownsville.

Page 15

1     Q. Okay. So you started working in Brownsville in
2  August of 2020?
3     A. That's correct.
4     Q. Okay. And when you started in Brownsville, were
5  you assigned to -- or were you asked to go back and
6  forth between Texas and California, between the time in
7  which you started at SpaceX, up until the time of the
8  crash?
9     A. My responsibilities were in Brownsville, but I
10 traveled frequently between Texas and California for
11 personal reasons.
12    Q. Okay. So your travel back to California would've
13 been for personal reasons between August of 2020 and
14 June of 2021; is that correct?
15    A. There were a few work trips in there, but most --
16 the majority was personal.
17    Q. Most of it was personal? Okay. All right. All
18 right. And so I understand that at the time of this
19 crash, you had a California driver's license; is that
20 correct?
21    A. That's correct, yes.
22    Q. When did you first become a licensed driver in
23 California?
24    A. Right at 16.
25    Q. Okay. And what did you have to do in order to

Page 16

1  get your driver's license in California?
2     A. I took a written test in order to get -- man. I
3  think I took a written test to get my permit, and then
4  six months of permit-only driving with an instructor and
5  somebody else in the car, 50 hours total. And then,
6  another written test, and an in-person driving test.
7     Q. Okay. And did you pass the driving test on the
8  first go-around?
9     A. I passed everything, yes.
10    Q. Okay. And what did you use to prepare for the
11 written test?
12    A. I don't recall. Some materials.
13    Q. Some materials? Okay. And I guess those
14 would've been materials that were provided to you by the
15 driver's ed school?
16    A. Yes.
17    Q. In general terms, do you remember what was
18 covered within those materials?
19    A. The general rules of driving and whatnot. I
20 don't remember.
21    Q. I guess the general rules of the road, so to
22 speak, correct?
23    A. Yeah, exactly.
24    Q. Okay. I'm sure they went over traffic signs,
25 correct?

4 (Pages 13 to 16)

Page 33

1  crashes, correct?
2       MS. PECTOR: Objection to counsel's
3  testimony on the record.
4     Q. You can answer that.
5     A. Yes.
6     Q. Okay. I mean, that's why -- that's why we have
7  driver's education, so that we're not a danger to the
8  driving public, correct?
9       MS. PECTOR: Objection to counsel's
10 testimony on the record.
11    Q. Is that correct?
12    A. Yes.
13    Q. Okay. All right. So as I understand it, you
14 were driving a 2019 Tesla at the time of this crash; is
15 that correct?
16    A. Yes.
17    Q. Who does that vehicle belong to?
18    A. I believe it's owned by SpaceX.
19    Q. Okay. And, I guess, why were you driving a
20 SpaceX vehicle at the time of the crash?
21    A. My personal vehicle was in the shop.
22    Q. Okay. So you were driving the SpaceX vehicle
23 because your vehicle was in the shop; is that correct?
24    A. Yes.
25    Q. Okay. And when you say your vehicle was in the

Page 34

1  shop, what vehicle are you referring to?
2     A. The 2012 -- the Acura 2012 BMW 3 Series.
3     Q. What shop was it at?
4     A. I believe it's called Antonio's Body Shop.
5     Q. Okay. What was wrong with the vehicle?
6     A. There was a mechanical thing.
7     Q. What kind of mechanical thing?
8     A. I believe the cooler was damaged.
9     Q. Okay. How did the cooler get damaged?
10    A. The vehicle had been in a collision with a deer a
11 couple of weeks beforehand.
12    Q. Okay. And this collision with the deer, where
13 did it occur?
14    A. On Highway 4.
15    Q. Okay. I guess that's here in -- I guess that's
16 out of Brownsville as well, correct?
17    A. It is.
18    Q. So you were involved in a collision with a deer.
19 How many weeks before this crash?
20    A. I don't recall exactly.
21    Q. Okay. Was it a month before, a couple of months
22 before, or what do you think?
23    A. Sure, roughly.
24    Q. Okay. And this BMW 3 Series, where did you
25 purchase it?

Page 35

1     A. I purchased it in California.
2     Q. Okay. Where did you purchase it in California?
3     A. From a private party.
4     Q. What is his or her name?
5     A. I couldn't tell you.
6     Q. Did you purchase it from a dealership?
7     A. No. It was a private party.
8     Q. Okay. And how did you come about this private
9  party?
10    A. Craigslist, or something similar.
11    Q. Okay. And who was the individual who gave you
12 permission to drive the SpaceX vehicle?
13       MS. PECTOR: Objection, assumes facts not in
14 evidence. Go ahead.
15    A. Yeah. Sergio Lara.
16    Q. Who was Sergio Lara?
17    A. He is one of the hospitality representatives.
18    Q. Okay. Who is he a hospitality representative
19 for?
20    A. SpaceX.
21    Q. Okay. Do you know whether Sergio Lara is based
22 out of South Texas?
23    A. I believe he is.
24    Q. And do you know what a hospitality representative
25 does?

Page 36

1     A. I couldn't tell you. He was my point of contact
2  for a vehicle.
3     Q. And when you say he was your point of contact for
4  vehicles, what do you mean by that?
5     A. That he was the one who helped me get the Tesla.
6     Q. He's the one who helped you get the Tesla?
7     A. Yes, that's correct.
8     Q. And, I guess, how did you know to contact Sergio
9  in case you needed help with the vehicle?
10    A. That's what I was suggested to do, by a coworker.
11    Q. Okay. Which coworker?
12    A. I don't remember.
13    Q. And, I guess, so based on your experience, I
14 guess one of the -- one of the duties and
15 responsibilities of a hospitality representative is to
16 provide employees, such as yourself, who may need a
17 vehicle temporarily, correct?
18       MS. PECTOR: Objection, calls for
19 speculation. Objection, assumes facts not in evidence.
20    Q. You can answer.
21    A. Okay. Sorry. Could you repeat the question?
22       MR. CISNEROS: Darla, can you repeat the
23 question for us? I'm sorry.
24       THE REPORTER: Yes, just one second. Okay.
25 I guess -- so based on your experience, I guess one of

9 (Pages 33 to 36)

BRYANT & STINGLEY, INC.

Harlingen (956) 428-0755          McAllen (956) 618-2366

Page 65

1  the moments leading up to the crash?
2      A.  No, I don't believe so.
3      Q.  Okay.  And at the time of the crash, did you have
4  a Bluetooth device on your ear?
5      A.  Definitely not on my ear, no.
6      Q.  Okay.
7          MR. CISNEROS:  All right.  Why don't we go
8  ahead and take a ten-minute break, and go back on the
9  record?
10         THE REPORTER:  We're off the record at 1:48
11 p.m.
12         (Brief recess.)
13         THE REPORTER:  We're back on the record at
14 2:05 p.m.
15     Q.  Mr. Morshedian, where were you going at the time
16 of the crash?
17     A.  I was on my way home.
18     Q.  And when you say "home," what do you mean by
19 that?  Which house?
20     A.  Sorry, the apartment I was visiting at the time.
21     Q.  The Las Palmas apartment?
22     A.  Again, I don't remember the exact one I was in at
23 this point.
24     Q.  Okay.  And what time had you started your day on
25 the day of the crash?  In other words, what time had you

Page 66

1  woken up, reported to work?
2      A.  I might've been in the office around 9:00 that
3  day.  I don't remember exactly, but that's common.
4      Q.  Is that typically the time you would report to
5  work, was 9:00 a.m.?
6      A.  Roundabout.  It varied significantly, depending
7  on work needs.
8      Q.  Depending on what?  I'm sorry?
9      A.  Like needs for the -- the specific, like, tasks
10 we were doing.  Sometimes I would be on night shift, for
11 example.
12     Q.  Sometimes you would be on night shift?
13     A.  Uh-huh.
14     Q.  What's night shift?
15     A.  Just showing up, you know, much later, and
16 leaving much earlier, you know, in the morning, the day
17 after.
18     Q.  And why would you be asked to report to night
19 shift?
20     A.  Sometimes that's when we had work going on.
21     Q.  Okay.  And night shift, is that a -- is that a
22 certain time span or timeframe?
23     A.  Generally, the dayshift is 6:00 to 6:00.  The
24 night shift is 6:00 -- 6:00 p.m. to 6:00 a.m.  And
25 dayshift is 6:00 a.m. to 6:00 p.m., per the -- the

Page 67

1  production team.  We would show up at the same time
2  every day.
3      Q.  Okay.  So at the time of this crash, you were on
4  day shift?  Is that --
5      A.  Yes, that's correct.
6      Q.  Now, you said you only worked 60 hours a week,
7  right?  Or, 50 hours a week, is what you said?
8      A.  Roughly, 50, yeah.
9      Q.  So were you -- would you have to -- did you ever
10 have to work 12-hour blocks, or were you just -- were
11 you constrained to the 50 hours a week?
12     A.  No.  I think those were all subject to -- to
13 variation.
14     Q.  Okay.  So on the day of the crash, you reported
15 to work around 9:00 a.m.
16     A.  Roundabout.
17     Q.  Okay.  And had you taken a lunch that day?
18     A.  I believe so.
19     Q.  Okay.  What time do you remember taking a lunch
20 that day?
21     A.  I really couldn't tell you.
22     Q.  Okay.  And your lunch, would you -- would you eat
23 it at Starbase, or would you go off -- off campus to go
24 eat?
25     A.  Always onsite.

Page 68

1      Q.  Why would you always eat onsite?
2      A.  Because it's quite far from downtown Brownsville
3  -- or, you know, in Brownsville.
4      Q.  Okay.  And typically, how long is your lunch?
5      A.  Thirty minutes.
6      Q.  Did you have lunch on the day -- on the day of
7  the crash?
8      A.  I believe so.
9      Q.  Do you have to pay for lunch?
10     A.  Yes.
11     Q.  All right.  So, I guess, what time would you have
12 left work at the time of the crash?
13     A.  Approximately 30 minutes prior.
14     Q.  Okay.  In this particular Tesla, did it have a
15 cruise control function?
16     A.  I don't recall.
17     Q.  Okay.  You don't know whether the Tesla had a
18 cruise control function; is that correct?
19     A.  I would assume so, but I don't remember.
20     Q.  Okay.  And going back to your BMW, when did you
21 purchase the vehicle?
22     A.  2018 or 2019.
23     Q.  Okay.  Was that the first time you've purchased a
24 vehicle?
25     A.  No, it's not.

17 (Pages 65 to 68)

Page 85

```
 1      I, ARION MORSHEDIAN, have read the foregoing
        transcript and hereby affix my signature that same is
 2      true and correct, except as noted above.
 3
 4      _____
        ARION MORSHEDIAN
 5
 6
 7
        THE STATE OF TEXAS        )(
 8
        COUNTY OF _____ )(
 9
10      Before me, _____, on this
11      day personally appeared ARION MORSHEDIAN, known to me
12      (or proved to me under oath or through _____)
13      (description of identity card or other document) to be
14      the person whose name is subscribed to the foregoing
15      instrument and acknowledged to me that they executed the
16      same for the purposes and consideration therein
17      expressed.
18      Given under my hand and seal of office this
19      _____ day of _____, 2023.
20
21
22      _____
        Notary Public in and for
23      The State of Texas
24
25
```

Page 86

```
 1      IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF TEXAS
 2           BROWNSVILLE DIVISION
 3
        HUGO MEDELLIN,         )(
 4      Plaintiff              )(
                               )(
 5      VS.                    )( CIVIL ACTION NO:
                               )( 1:22-CV-084
 6                             )(
        SPACE EXPLORATION      )(
 7      TECHNOLOGIES, CORP., ET AL, )(
        Defendants             )(
 8
             REPORTER'S CERTIFICATE
 9
10      I, DARLA BARKER, Certified Court Reporter No.
        10980, in and for the State of Texas, certify that the
11      witness, ARION MORSHEDIAN, was duly sworn by me, and
        that the deposition transcript is a true and correct
12      record of the testimony given by the witness on FEBRUARY
        16, 2023, and that the deposition was reported remotely
13      by me in oral stenography and was subsequently
        transcribed under my supervision.
14
             I FURTHER CERTIFY that I am not a employee,
15      relative, attorney or counsel of any of the parties, nor
        a relative or employee of such attorney or counsel, nor
16      am I financially interested in the action.
17      WITNESS MY HAND on this the _____ day of
        _____, 2023.
18
19      _____
        DARLA BARKER, CSR NO. 10980
20      Expiration Date: 10/31/24
        Bryant & Stingley, Inc.
21      Firm Registration No. 41
        2010 East Harrison
22      Harlingen, Texas 78550
        1-956-428-0755
23
24
25
```

22 (Pages 85 to 86)

BRYANT & STINGLEY, INC.

Harlingen (956) 428-0755          McAllen (956) 618-2366

Electronically signed by Darla Barker (001-099-836-8188)          7a5ff7fd-0cfe-43fe-b30f-86359bc97a8b